IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

OPTOLUM, INC.,                    )
                                  )
            Plaintiff,            )
                                  )
      v.                          )          1:17CV687
                                  )
CREE, INC.,                       )
                                  )
            Defendant.            )


**CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

      This matter is before the court for claim construction of

terms in U.S. Patents Nos. 6,831,303 ("the '303 Patent") and

7,242,028 ("the '028 Patent").[1,2] The parties, Plaintiff OptoLum,

Inc. ("Plaintiff") and Defendant Cree, Inc. ("Defendant") agree

with respect to construction of several claim terms and the

court adopts those agreed-upon constructions. (Joint Claim

Construction Statement (Doc. 106) at 1-2.) The parties disagree,

_____

      [1] The '028 Patent is a continuation of the '303 Patent. '028
Patent col. 1, lines 5-9. While a few differences exist between
the two patents, both parties agree that they are largely the
same for purposes of claim construction. (See Def.'s Mem. in
Supp. of its Claim Construction ("Def.'s Mem.") (Doc. 115) at 7
& n.1; OptoLum's Opening Mem. in Supp. of Claim Construction
("Pl.'s Mem.") (Doc. 118) at 10 & n.2.)

      [2] All citations in this Memorandum Opinion and Order to
documents filed with the court refer to the page numbers located
at the bottom right-hand corner of the documents as they appear
on CM/ECF.

however, as to construction of eight terms in the '303 and '028 Patents and submitted proposed constructions of those terms. (Id. at 2-3.) Both parties submitted claim construction briefs, (Doc. 115 (Defendant); Doc. 118 (Plaintiff)), and responsive briefs, (Doc. 127 (Defendant); Doc. 128 (Plaintiff)). The court held a claim construction hearing on January 16, 2018, at which time the court took this matter under advisement. On May 29, 2018, this court requested supplemental briefing, (Doc. 139), which the parties thereafter filed, (Doc. 140 (Plaintiff); Doc. 141 (Defendant)). On June 19, 2018, this court requested responses to the supplemental briefing, (Text Order 06/19/2018), which the parties thereafter filed, (Doc. 144 (Defendant); Doc. 146 (Plaintiff)).

## I.     **LEGAL STANDARD**

In Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), the Supreme Court clarified which issues in a patent trial are properly reserved for the jury, and which are questions of law to be determined by the court. Specifically, the Court held that interpretation of language in patent claims "is an issue for the judge, not the jury[.]" Id. at 391. The Federal Circuit has provided further guidance on how to interpret patent claims, stating that, in general, courts are to give the words of a claim "their ordinary and customary meaning"

as understood by "a person of ordinary skill in the art in question at the time of the invention[.]" <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (citations omitted).

In construing claim terms, courts are directed to consult several specific types of evidence to discern what a person of ordinary skill in the art would understand the term to mean.

> Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." Those sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."

<u>Id.</u> at 1314 (citations omitted).

First, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." <u>Id.</u> (citation omitted). "To begin with, the context in which a term is used in the asserted claim can be highly instructive." <u>Id.</u> Federal Circuit case law "provide[s] numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term." <u>Id.</u> (citations omitted).

> Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.

> Because claim terms are normally used consistently
> throughout the patent, the usage of a term in one
> claim can often illuminate the meaning of the same
> term in other claims. Differences among claims can
> also be a useful guide in understanding the meaning of
> particular claim terms. For example, the presence of a
> dependent claim that adds a particular limitation
> gives rise to a presumption that the limitation in
> question is not present in the independent claim.

Id. at 1314-15 (citations omitted). "The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." Thorner v. Sony Comput. Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citation omitted).

The second type of evidence the court should consider is the specification, which "contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention." See Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996); see also Phillips, 415 F.3d at 1315. "Claims must be read in view of the specification, of which they are a part." Markman, 52 F.3d at 979 (citations omitted). The claims define the invention, but "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Phillips, 415 F.3d at 1315 (citation omitted).

"For claim construction purposes, the description may act as a
sort of dictionary, which explains the invention and may define
terms used in the claims." _Markman_, 52 F.3d at 979 (citation
omitted). "[A] patentee is free to be his own
lexicographer[, but] . . . any special definition given to a
word must be clearly defined in the specification." _Id._ at 980
(citations omitted). "[C]laims are not to be interpreted by
adding limitations appearing only in the specification. . . .
[P]articular embodiments appearing in a specification will not
be read into the claims when the claim language is broader than
such embodiments." _Electro Med. Sys., S.A. v. Cooper Life Scis.,
Inc._, 34 F.3d 1048, 1054 (Fed. Cir. 1994) (citations omitted). A
limitation from the specification should only be read into the
claims when the specification requires that limitation. _See id._

The third type of evidence that a court should consider is
the patent's prosecution history. _See Phillips_, 415 F.3d at
1317; _see also Markman_, 52 F.3d at 980; _Vitronics Corp. v.
Conceptronic, Inc._, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "This
'undisputed public record' of proceedings in the Patent and
Trademark Office is of primary significance in understanding the
claims." _Markman_, 52 F.3d at 980 (citation omitted). "The
prosecution history limits the interpretation of claim terms so
as to exclude any interpretation that was disclaimed during

prosecution. Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995) (citations omitted).

There are two relevant exceptions to the general rule that claim terms "are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art[.]" Thorner, 669 F.3d at 1365 (citation omitted).

> First, the claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or prosecution history. Second, a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the patentee distinguished that term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention.

CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366-67 (Fed. Cir. 2002) (citations omitted); see also Thorner, 669 F.3d at 1365.

The redefinition of a claim term must be clear "so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc., 262 F.3d 1258, 1268 (Fed. Cir. 2001) (citations omitted). However, redefinition need not be explicit. Id. "[T]he specification may define claim terms 'by implication' such that the meaning may be

'found in or ascertained by a reading of the patent documents.'" Id. (citation omitted); see also Trs. of Columbia Univ. v. Symantec Corp., 811 F.3d 1359, 1364 (Fed. Cir. 2016).

"The party seeking to invoke prosecution history disclaimer bears the burden of proving the existence of a 'clear and unmistakable' disclaimer that would have been evident to one skilled in the art." Mass. Inst. of Tech. v. Shire Pharm., Inc., 839 F.3d 1111, 1119 (Fed. Cir. 2016) (citation omitted); see also Omega Eng'g, Inc., v. Raytek Corp., 334 F.3d 1314, 1324 (Fed. Cir. 2003) (stating that a disclaimer occurs where the "patentee has unequivocally disavowed a certain meaning to obtain his patent"). Said disavowal must be clear and may not be "too vague or ambiguous[.]" Omega Eng'g, 334 F.3d at 1325 (citation omitted).

Evidence from sources other than the claims, the specification, and the prosecution history is extrinsic and generally should be relied upon only when the intrinsic evidence fails to resolve any ambiguity in a disputed term. See Vitronics, 90 F.3d at 1583; see also Phillips, 415 F.3d at 1318-19. Extrinsic evidence includes "expert and inventor testimony, dictionaries, and learned treatises." Markman, 52 F.3d at 980. A court may use extrinsic evidence to aid its understanding of a patent, but "not for the purpose of varying or contradicting the

terms of the claims." Id. at 981 (citations omitted).

Accordingly, the Federal Circuit has stated that "expert

testimony, whether it be of an attorney, a technical expert, or

the inventor, on the proper construction of a disputed claim

term . . . . may only be relied upon if the patent documents,

taken as a whole, are insufficient to enable the court to

construe disputed claim terms." Vitronics, 90 F.3d at 1585

(emphasis omitted). In such "rare instances," prior art

documents and dictionaries are preferable to expert testimony

because they are objective, reliable, and "accessible to the

public in advance of litigation." Id. With these guiding

principles in mind, the court proceeds to construe the claim

terms at issue.

## I. **DISCUSSION**

### A. **"carried on"**

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "carried on" (all claims) | "supported on" | "in direct contact with, and supported by" |

The court starts by considering the claim term itself and

the ordinary meaning that would be attributed to the term by a

person skilled in the relevant art. This term appears in

multiple claims. Claim 1, for example, references "a plurality

of solid state light sources carried on said elongate member

outer surface[.]" Patent '028 col. 4, lines 34-35. Taken in isolation, this claim term is self-explanatory and appears to be in need of no special construction.

Next, this court reads the claim term in light of the '028 Patent's specification. The specification of the '028 Patent discloses a "heat conducting epoxy" between the tube and the light-emitting diodes ("LEDs") that aids in the transmission of heat between the tube and the LEDs. '028 Patent col. 3, lines 47-49. Defendant advocates for a construction of "carried on" that is more limited than the term's plain meaning and which requires direct contact between the solid state light sources and the elongate member's outer surface. Unless an exception applies, it is generally error to adopt a construction which excludes a preferred embodiment. See, e.g., MBO Labs., Inc. v. Becton, Dickinson & Co., 474 F.3d 1323, 1333 (Fed. Cir. 2007); On-Line Techs., Inc. v. Bodenseewerk Perkin-Elmer GMBH, 386 F.3d 1133, 1138 (Fed. Cir. 2004). Because the specification contains a preferred embodiment which does not require direct contact, a person skilled in the relevant art would understand "carried on" to mean "supported on."

Next, the court looks to the prosecution history of the patents at issue. It is here that Defendant contends that the applicant disclaimed the contention "that the claimed invention

covers a device having an intervening structure between the LEDs and the ETCM [elongate thermally conductive member]." (Def.'s Mem. in Supp. of its Claim Construction ("Def.'s Mem.") (Doc. 115) at 14.) While claims will normally not be interpreted in a way that excludes an embodiment disclosed in the specification, an exception to this rule is when a clear disclaimer is made during prosecution. Oatey Co. v. IPS Corp., 514 F.3d 1271, 1277 (Fed. Cir. 2008); N. Am. Container, Inc. v. Plastipak Packaging, Inc., 415 F.3d 1335, 1345-46 (Fed. Cir. 2005). Here, Defendant, the party seeking to invoke a prosecution history disclaimer, carries the burden. See Shire Pharm., 839 F.3d at 1119. It must establish that the applicant unequivocally disclaimed that the invention covers a device where a structure intervenes between the LEDs and the elongate thermally conductive member. See Omega Eng'g, 334 F.3d at 1324-25.

In the prosecution of the '028 Patent, the applicant made statements responsive to the examiner's initial rejection of the invention as anticipated by U.S. Patent 6,848,819 ("the '819 Patent"). (Decl. of Lynne A. Borchers ("Borchers Decl."), Ex. E, '028 File History Amendment (Doc. 117-5) at 20 ("The '819 patent teaches away from Applicant's novel structures.").) Generally discussing the '819 Patent, the applicant stated:

> [T]he structures of the '819 patent require that the
> LEDs are carried on copper solder pads on one surface

- 10 -

of a circuit board and heat transfer is via solder
pads through the circuit board to a metallization
layer on the opposite surface of the circuit board and
then to the cooling member via an adhesive layer.

The LEDs are not carried by the cooling member.

(Id. at 21.) Later, when arguing that the examiner incorrectly

applied the standard for anticipation, the applicant referenced

figures from the '819 Patent and distinguished it from the

invention at issue, stating:

It is clear from the drawings that the thermally
conductive member 3 does not carry its LEDs 2 on its
outer surface. Rather, the thermally non-conductive
printed circuit board 1 carries the LEDs 2. The
Examiner's attention is again directed to the
reproduced portions of the reference above which
clearly state that the LEDs are carried on the printed
circuit board 1 and not on the structure 3.

It is clear from a plain reading of the
descriptions of the structures in the '819 patent that
the printed circuit board 1 carries LEDs 2 on one
surface and carries the heat sink 3 (thermally
conductive member) on its opposite surface.

In other words, the '819 patent teaches away from
the novel structures of applicant's claimed invention
which set forth structure in which the LEDs, solid
state light sources, radiation emitting semiconductor
devices, and radiation emitting solid state devices
are carried on an elongate thermally conductive
member.

(Id. at 27.) While applicant certainly used the term "carried

on" during the patent prosecution, the statements at issue were

not made with respect to whether direct contact was required but

instead with respect to which structure within the '819 patent

supported various other parts of the invention. Here, nothing in the prosecution record amounts to a clear and unambiguous disavowal. See <u>SanDisk Corp. v. Memorex Prods., Inc.</u>, 415 F.3d 1278, 1287 (Fed. Cir. 2005) ("There is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term." (citation omitted)).

Extrinsic evidence only serves to further support this conclusion. The court finds the following dictionary definitions of "carry" to be helpful in educating it as to possible ordinary meanings of this claim term: "to bear the weight of," <u>Webster's New World Dictionary</u> (3d College ed. 1989), and "to hold or be capable of holding," <u>Webster's II New College Dictionary</u> (2001); <u>see also</u> <u>Phillips</u>, 415 F.3d at 1319 ("[B]ecause extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean, it is permissible for the district court in its sound discretion

to admit and use such evidence.").[3] The court has also considered whether expert testimony could further educate it as to possible ordinary meanings. Looking to expert testimony provided as to this term, however, is unhelpful in further educating the court at this point in its analysis as the experts are in disagreement as to how such a person would understand the term. (Compare Decl. of Leah R. McCoy, Ex. 3, Expert Decl. of A. Brent York on Claim Construction ("York Decl.") (Doc. 119-3) ¶ 54, with Supplemented Decl. of Dr. Eric Bretschneider ("Bretschneider Suppl. Decl.") (Doc. 116) ¶¶ 50-52.) Because the court cannot evaluate the credibility of the experts based on their declarations alone, it will refrain from weighing the testimony at this juncture and rely on the outcome clearly supported by the intrinsic evidence.

Having considered the claim term, the specification, the prosecution history, and for the purpose of educating the court, extrinsic evidence, this court finds that a person of ordinary skill in the art would construe "carried on" as "supported on."

---

[3] These definitions are consistent with other courts' plain meaning construction of "on" or "carried on" to require support but not direct contact. See Spectralytics, Inc. v. Cordis Corp., 576 F. Supp. 2d 1030, 1038, (D. Minn. 2008), aff'd, 649 F.3d 1336 (Fed. Cir. 2011); IPS Corp. v. WCM Indus., Inc., No. 2:12-CV-02694-JPM, 2014 WL 8508558, at *13 (W.D. Tenn. Sept. 18, 2014); Produits Berger S.A. v. Schemenauer, No. CIVA 2:06CV002, 2007 WL 809611, at *9 (E.D. Tex. Feb. 27, 2007).

Accordingly, this court will adopt Plaintiff's construction of this term.

## B.   "a plurality of solid state light sources"

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "a plurality of solid state light sources" ('028 Patent, claims 1-3, 5-8, 14, & 16-17) | "two or more packages, each of which comprise a thermally conductive back and a solid state light source" | "two or more packages, each of which comprise a solid state light source" |

The court starts by considering the claim term itself and the ordinary meaning that would be attributed to the term by a person skilled in the relevant art. Claim 1 of the '028 Patent, for example, describes "a plurality of solid state light sources carried on said elongate member outer surface[.]" '028 Patent col. 4, lines 33-37.[4] Here, the parties agree that "plurality" should be construed as "two or more," (Joint Claim Construction Statement (Doc. 106) at 2), consistent with its plain and ordinary meaning, see York Prods., Inc. v. Cent. Tractor Farm & Family Ctr., 99 F.3d 1568, 1575 (Fed. Cir. 1996). The parties' narrow disagreement with respect to this term is whether a

_____

[4]   The "solid state light source" terminology reflects a difference between the '028 Patent and the '303 Patent. The earlier '303 Patent references "LEDs" while the '028 Patent references "solid state light sources" in an otherwise identical Claim 1. Compare '303 Patent col. 4, lines 29-30, with '028 Patent col. 4, lines 34-35.

"thermally conductive back" is necessarily included in this definition. Taken in isolation, this claim term does not appear to be limited to packages with a thermally conductive back.

Next, the court considers this claim term in light of the '028 Patent's specification. The '028 Patent's specification, however, does not describe "solid state light sources" and refers exclusively to "LEDs." See generally '028 Patent cols. 1-4. Although the parties agreed to construe "a plurality of light emitting diodes" as "two or more packages, each of which comprise a thermally conductive back and a diode that emits light[,]" (Joint Claim Construction Statement (Doc. 106) at 1), the specification does not make clear how LEDs differ from solid state light sources. Further, both parties agree that LEDs are a subset of solid state light sources, but neither points to compelling material within the intrinsic evidence to explain how they differ. (See OptoLum's Opening Mem. in Supp. of Claim Construction ("Pl.'s Mem.") (Doc. 118) at 29; Def.'s Mem. (Doc. 115) at 14.) The specification provides that "[f]lexible printed circuit 113 has mounting holes 134 for receiving LEDs 109 such that the backs of LEDs 109 are in thermal contact with the tube surface 107." '028 Patent col. 3, lines 45-51. Because the difference between LEDs and solid state light sources with respect to this invention is unclear, however, the court cannot

conclude from the specification that solid state light sources likewise require thermally conductive backs. "[C]laims are not to be interpreted by adding limitations appearing only in the specification. . . . [P]articular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments." Electro Med. Sys., 34 F.3d at 1054; see also GE Lighting Solutions v. AgiLight, Inc., 750 F.3d 1304, 1310 (Fed. Cir. 2014).

Next, the court looks to the prosecution history. Here, the court does not find any evidence relevant to this claim term. Having considered the claim term, the specification, and the prosecution history, the court concludes that a "thermally conductive back" limitation should not be read into this claim term. The extrinsic evidence only serves to further support the court's conclusion. While the parties' witnesses disagree with respect to their ultimate conclusion as to this term, only the Defendant's expert discusses how an LED and a solid state light source differ and how such differences might affect the construction of this term. (Compare York Decl. (Doc. 119-3) ¶¶ 78-79 (stating that a person of ordinary skill in the art would understand that the package includes a thermally conductive back but not going into why this is necessarily the case for all solid state light sources as compared to just

LEDs), <u>with</u> Bretschneider Suppl. Decl. (Doc. 116) ¶¶ 76–84 (stating that solid state light sources encompass LEDs and that "the full scope of the SSLS [solid state light source] phrase is indeterminate. This is because neither the patent specification nor its prosecution history explain or refer to the [solid state light source] phrase and it is not apparent to a POSA [person of ordinary skill in the art] what other structures which fall within the plain meaning of the phrase but which may or may not be suitable to be incorporated in the overall structure described in the '028 patent."). Here, the only expert witness that directly engages this issue shares the court's concern about how LEDs and solid state light sources differ in scope. Accordingly, this court will adopt Defendant's proposed construction of the term "a plurality of solid state light sources" as "two or more packages, each of which comprise a solid state light source."

**C.** **"disposed in a second plane not coextensive with said first plane"**

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "disposed in a second plane not coextensive with said first plane" (all claims) | "arranged in a second flat surface not having the same spatial boundaries as the first flat surface" | "disposed in a second plane that is not the same as the first plane wherein the plurality of LEDs are not disposed in a single plane perpendicular to the axis of the elongate thermally conductive member" |

The court starts with the claim term itself and the ordinary meaning that would be attributed to the term by a person skilled in the relevant art. This term appears, for example, in Claim 1 of the '028 Patent, which describes:

> [A] plurality of solid state light sources carried on said elongate member outer surface at least some of said solid state light sources being disposed in a first plane and others of said solid state light sources being disposed in a second plane not coextensive with said first plane[.]

'028 Patent col 4, lines 33-38.

The court next considers this claim term in light of the '028 Patent's specification. See Markman, 52 F.3d at 979. Within the summary of the invention, Patent '028 describes "[a] plurality of light emitting diodes is carried on the elongate member outer surface. At least some of the light emitting diodes are disposed in a first plane and others of said light emitting

diodes are disposed in a second plane not coextensive with the
first plane." '028 Patent col 1, lines 49-53. Similarly worded
to Claim 1, above, the use of the term in the specification does
not provide much insight.

Next, the court turns to the prosecution history. See
Markman, 52 F.3d at 980; see also Vitronics, 90 F.3d at 1582. It
is here that Defendant contends that, in distinguishing the '028
Patent from the '819 Patent, the applicant disclaimed "the
circumstance in which LEDs are placed in a single plane
perpendicular to the axis of the elongate heat sink." (Def.'s
Mem. (Doc. 115) at 20.) Defendant, the party seeking to invoke a
prosecution history disclaimer, carries the burden of proving
that there was a "clear and unmistakable" disclaimer that would
have been evident to a person of ordinary skill in the art. See
Shire Pharm., 839 F.3d at 1119 (citation omitted). In the
prosecution of what became the '028 Patent, applicant made
statements in response to the examiner rejecting the application
as anticipated by the '819 patent. ('028 File History Amendment
(Doc. 117-5) at 23.) Statements relevant to the disputed claim
terms centered around the below-pictured figure from the '819
Patent, also contained in applicant's amendment/response:



(<u>Id.</u> at 26.) Applicant stated in relevant part:

> [T]he Examiner points to FIG. 2B as showing solid
> state light sources that are in a first plane and a
> second plane not coextensive with the first plane. The
> Examiner is mistaken. <u>All the LEDs shown in FIG. 2B
> are in the same plane, i.e., the plane defined by the
> drawing sheet.</u>

(<u>Id.</u> at 27.) Plaintiff contends that no such disavowal was made,

pointing out that the '028 Patent refers to LEDs being

"disposed" in a plane whereas the prosecution history references

LEDs being "in" the same plane defined by the drawing sheet.

(Pl.'s Suppl. Mem. in Supp. of Claim Construction ("Pl.'s Suppl.

Mem.") (Doc. 140) at 8-9.) Plaintiff further contends that the

"clear and unmistakable standard" was not met because the

statements at issue were made with respect to a two-dimensional

drawing and could be interpreted as highlighting an evidentiary

defect in the Examiner's initial refusal. (<u>Id.</u> at 10 & n.4.)

This court is unpersuaded by Plaintiff's arguments. Applicant's statements made during patent prosecution were in response to the Examiner's statement that Figure 2B in the '819 Patent illustrated "solid state light sources that are in a first plane and a second plane not coextensive with the first plane." ('028 File History Amendment (Doc. 117-5) at 27.) This issue was raised in relation to the Examiner's initial position that the claimed invention was anticipated by prior art, the '819 Patent. Applicant responded to the Examiner's position by contending that "[a]ll the LEDs shown in FIG. 2B are in the same plane, i.e., the plane defined by the drawing sheet[,]" thereby distinguishing the claimed invention from the '819 Patent. (See id.) This statement carries more significance than merely "highlighting an evidentiary defect" as Plaintiff contends, and was made in an effort to refute the Examiner's position as to anticipation. This court finds such a statement to amount to a

clear and unequivocal disclaimer. See Shire Pharm., 839 F.3d at

1119; Omega Eng'g, 334 F.3d at 1324.[5]

The disclaimer that was made is extremely narrow, however.

Applicant distinguished the claimed invention from one in which

_____

[5] Plaintiff contends that because the above-discussed
argument made by applicant with respect to the '819 Patent was
rejected by the Examiner that it cannot serve as the basis of a
disclaimer. To support this contention, Plaintiff cites to
TriVascular, Inc. v. Samuels, 812 F.3d 1056, 1064 (Fed. Cir.
2016). (Pl.'s Mem. (Doc. 118) at 26; Pl.'s Suppl. Mem. (Doc.
140) at 10.) TriVascular does not directly support Plaintiff's
argument. As explained by a Northern District of Illinois court
in Not Dead Yet Manufacturing Inc. v. Pride Solutions, LLC, 265
F. Supp. 3d 811, 831-32 (N.D. Ill. 2017), reconsideration
denied, No. 13 C 3418, 2018 WL 688324 (N.D. Ill. Feb. 2, 2018),
the patentee in TriVascular attempted to distinguish prior art
by proposing an amendment with a new limitation, but later

> changed their positions on the need for the amendment
> [and] the examiner thus deleted the amendment and
> approved the claims without the . . . limitation. Thus
> because the proposed amendment was not ultimately
> adopted and there appeared to be change of position by
> both the examiner and the patentee after the amendment
> was proposed, it was "difficult to see how a skilled
> artisan could interpret the proposed amendment as a
> disclaimer required for patentability."

Id. at 832 (citing TriVascular, 812 F.3d at 1064). Similarly, in
this case, there is no evidence that Plaintiff changed its
position such that any person of ordinary skill in the art would
have reason to believe that it withdrew the arguments made in
distinguishing prior art. See id. As reasoned by the Northern
District of Illinois court, "[a]n assertion made during
prosecution may create an estoppel 'whether or not [it was]
actually required to secure allowance of the claim . . . because
the relevant inquiry is whether a competitor would reasonably
believe that the applicant had surrendered the relevant subject
matter.'" Id. at 831 (quoting PODS, Inc. v. Porta Stor, Inc.,
484 F.3d 1359, 1367 (Fed. Cir. 2007)).

LED placement may be described as being in a single plane
perpendicular to the axis of the elongate thermally conductive
member. In other words, the two plane limitation is tied to the
elongate nature of the elongate thermally conductive member such
that Plaintiff's proffered explanation of Figure 2 of the '028
and '303 Patents and Figure 2B of the '819 Patent meeting the
two plane limitation, pictured below, is unavailing:



(Pl.'s Suppl. Mem. (Doc. 140) at 7.) Instead, this court is
convinced that Defendant's proffered conceptualization of the
two plane limitation, pictured below, is in keeping with the
patent's teachings and prosecution history:



**FIG. 1**

(Def.'s Suppl. Mem. in Resp. to Ord. of Court and in Supp. of
its Claim Construction ("Def.'s Suppl. Mem.") (Doc. 141) at 7.)
In accordance with the overall teachings of the patent, this
court will adopt Defendant's proposed construction: "disposed in
a second plane that is not the same as the first plane wherein
the plurality of LEDs are not disposed in a single plane
perpendicular to the axis of the elongate thermally conductive
member."

D.   **"plane"**

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "plane" (all claims) | "a flat surface" | plain and ordinary meaning[6] |

The court starts with the claim term itself and the
ordinary meaning that would be attributed to the term by a
person skilled in the relevant art. Closely related to the prior
term, "plane" likewise appears, for example, in Claim 1 of the
'028 Patent, which describes:

> [A] plurality of solid state light sources carried on
> said elongate member outer surface at least some of
> said solid state light sources being disposed in a
> first plane and others of said solid state light
> sources being disposed in a second plane not
> coextensive with said first plane[.]

'028 Patent col 4, lines 33-38. Plaintiff advocates for "plane"
to be construed as "a flat surface." (York Decl. (Doc. 119-3)
¶ 61 (claiming that a person of ordinary skill in the art would
understand "plane," in the context of the OptoLum patents, to
require "a flat surface on which to arrange the LEDs"). On the
other hand, Defendant first advocated for "plane" to be given
its plain and ordinary meaning, while contending that

---

[6] In Defendant's supplemental memorandum, it proposed the
following alternative construction, which mirrors language
referenced by its expert in prior filings: "a spatial
relationship concerning certain identified locations on the
elongate heat sink and having the specific mathematical
description of a plane." (Def.'s Suppl. Mem. (Doc. 141) at 12.)

Plaintiff's proposed "flat surface" construction would not be in keeping with said plain and ordinary meaning. (Bretschneider Suppl. Decl. (Doc. 116) ¶ 64 ("'[P]lane' in this context is understood by a POSA [person of ordinary skill in the art] to be a spatial relationship concerning certain identified locations on the elongate heat sink and having a specific mathematical description, i.e., that of a plane. In the context of the patents, the term 'plane' is not a physical 'surface' nor does it include the inaccurate descriptor of 'flat.'").) A finding that the plain and ordinary meaning of the claim term should be adopted would be inadequate because it would "not resolve the parties' dispute[,]" specifically whether "plane" should be construed as referring to physical, flat surfaces alone. See O2 Micro Int'l v. Beyond Innovation Tech. Co., 521 F.3d 1351, 1362 (Fed. Cir. 2008). Accordingly, in its supplemental briefing, Defendant proposed the following alternative construction of "plane": "a spatial relationship concerning certain identified locations on the elongate heat sink and having the specific mathematical description of a plane." (Def.'s Suppl. Mem. (Doc. 141) at 12.) Plaintiff protests that this proposed construction is too lengthy and "circular." (Pl.'s Resp. Mem. in Supp. of Claim Construction (Doc. 146) at 4-6.)

The court next considers this claim term in light of the '028 Patent's specification. See Markman, 52 F.3d at 979. Within the summary of the invention, Patent '028 describes "[a] plurality of light emitting diodes is carried on the elongate member outer surface. At least some of the light emitting diodes are disposed in a first plane and others of said light emitting diodes are disposed in a second plane not coextensive with the first plane." '028 Patent col 1, lines 48-53. It is here that Plaintiff contends that the specification ties "disposed in a . . . plane" to a flat surface. (Pl.'s Suppl. Mem. (Doc. 140) at 11.) While the specification and abstract mention LEDs being mounted on the elongate member's outer surface, "plane" is used to describe the fashion in which the LEDs are arranged and it is not necessarily linked with the physical flat elongate member's outer surface.

Next, the court turns to the prosecution history. See Markman, 52 F.3d at 980; see also Vitronics, 90 F.3d at 1582. First, applicant's usage of the term within the prosecution history is consistent with the term not being limited to physical flat surfaces, as it was used to describe a "plane defined by the drawing sheet." ('028 File History Amendment (Doc. 117-5) at 27.) Second, with respect to applicant's above-discussed disclaimer, the "plane" of the invention implicated by

the disclaimer – the plane perpendicular to the axis of the elongate thermally conductive member – is likewise not tied to the physical, flat surfaces thereof. Construing claim terms consistently with their usage in the patent's intrinsic evidence, Nystrom v. TREX Co., 424 F.3d 1136, 1145 (Fed. Cir. 2005), this court adopts Defendant's proffered construction of "plane": "a spatial relationship concerning certain identified locations on the elongate heat sink and having the specific mathematical description of a plane."

E.    **"heat dissipation protrusion"**

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "heat dissipation protrusion" (all claims) | "projection from a surface designed to convect heat" | plain and ordinary meaning |

The court starts with the claim term itself and the ordinary meaning that would be attributed to the term by a person skilled in the relevant art. Considering this term as it appears within the claims alone does not provide much guidance. For example, Claim 1 of the '028 Patent references the term, stating, "said elongate thermally conductive member comprises one or more heat dissipation protrusions, at least one of said heat dissipation protrusions being carried on said elongate member outer surface." '028 Patent col. 4, lines 47-50.

While this claim term appears in claims within both the
'028 and '303 patents, it only appears in the specification of
the '028 patent. <u>Compare</u> '028 Patent col. 3, lines 4-9
(referring to "heat dissipating protrusions"), <u>with</u> '303 Patent
col. 2, line 67 – col. 3, line 2 (referring to "heat dissipating
fins"). The detailed description within the specification of the
'028 Patent provides:

> To improve the heat dissipative properties of light
> source 100, elongate heat sink 101 is configured to
> provide convective heat dissipation and cooling. As
> more clearly seen in FIG. 2, tubular heat sink 101 is
> hollow and has an interior cavity 103 that includes
> one or more heat dissipating protrusions 105.
> Protrusions 105 are shown as being triangular shaped
> fins but may take on other shapes. Protrusions or fins
> 105 are integrally formed on the interior of elongate
> heat sink 101. Each pair of fins 105 defines a channel
> 105*a*. In the illustrative embodiment convective
> cooling is provided by movement of a medium 102
> through the channel formed by elongate heat sink 101.
> The medium utilized in the illustrative embodiment is
> air, but may in some applications be a fluid other
> than air to provide for greater heat dissipation and
> cooling.

'028 Patent, col. 3, lines 1-17. Here, "fins" and "heat
dissipating protrusions" are used interchangeably, as fins are
one form protrusions may take. The summary of the invention of
the '028 Patent, referring to "fins," provides in part:

> the elongate thermally conductive member transfers
> heat from the light emitting diodes to a medium within
> said elongate thermally conductive member. In the
> illustrative embodiment of the invention, the medium
> is air.

> In accordance with another aspect of the
> invention, the elongate thermally conductive member
> has one or more fins to enhance heat transfer to the
> medium.

'028 Patent, col. 1, line 65 - col. 2, line 5. Defendant

contends that Plaintiff's proposed construction is inaccurate

because the fins themselves do not convect heat, but the medium

(i.e., air) inside the elongate heat sink does. (Def.'s Mem.

(Doc. 115) at 21-22.) Plaintiff, on the other hand, insists that

the concept of convection is broad enough to encompass the

transfer of heat from the surface of the protrusions in question

to the fluid inside the elongate member. (Pl.'s Resp. to Cree's

Claim Construction Br. ("Pl.'s Resp.") (Doc. 128) at 26.)

Plaintiff further suggests that the definition appropriately

uses the phrase "designed to" in accordance with this

understanding of heat convection. (Id. at 26.) Nothing within

the prosecution history runs contrary to this understanding of

the term.

Finally, the court looks to dictionary definitions of

"dissipation" and "protrusion" to further aid in its

understanding of possible plain meanings of said terms. The

court finds the following definition of "dissipate" to support

its understanding of the intrinsic evidence: "to cause to lose

(e.g., heat) irreversibly." Webster's II New College Dictionary

(2001). The court likewise finds the following definition of

"protrude" instructive: "to jut out." <u>Id.</u> Looking to expert
testimony as to this term, however, is unhelpful in further
educating the court at this point in its analysis as the experts
are in disagreement as to what a person of ordinary skill in the
art would understand the term to mean. (<u>Compare</u> York Decl. (Doc.
119-3) ¶ 72, <u>with</u> Bretschneider Suppl. Decl. (Doc. 116)
¶¶ 68-69.)

Because a person of ordinary skill in the art would
understand the patent to teach that the heat dissipation
protrusions, or fins, serve to increase convection by increasing
the surface area within the elongate member from which heat is
transferred to the air, (<u>see</u> '028 Patent, col. 2, lines 3-5
("[T]he elongate thermally conductive member has one or more
fins to enhance heat transfer to the medium.")), this court will
adopt Plaintiff's proposed construction.

### F.    <u>"contained"</u>

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "contained" (all claims) | plain and ordinary meaning[7] | "enclosed by" |

The court starts with the claim term itself and the
ordinary meaning that would be attributed to the term by a

---

[7] Plaintiff argues in the alternative that, to the extent a
construction is warranted, the term can be properly understood
as "found within." (<u>See</u> Pl.'s Resp. (Doc. 128) at 28.)

person skilled in the relevant art. Claim 1 of the '028 Patent reads in relevant part, "said elongate thermally conductive member being configured to conduct heat away from said solid state light sources to fluid <u>contained</u> by said elongate thermally conductive member[.]" '028 Patent col. 4, lines 43-46 (emphasis added). In this instance, a finding that the term at issue should retain its plain and ordinary meaning alone would not resolve the underlying dispute between the parties. See <u>O2 Micro Int'l</u>, 521 F.3d at 1362. Defendant advocates for a construction of "enclosed by," which this court understands to mean total enclosure, or containment on all sides, <u>see, e.g.</u>, <u>Webster's II New College Dictionary</u> (2001) ("to surround on all sides"); <u>Webster's New World Dictionary</u> (3d College ed. 1989) ("to shut in all around; hem in; fence in; surround"), whereas Plaintiff advocates for a construction of "found within," which does not require total enclosure.

The court next looks to the specification. While the specification does not use the phrase "contained," it further explains the context surrounding its usage in above-quoted Claim 1. First, the summary of the invention generally explains that, "the elongate thermally conductive member transfers heat from the light emitting diodes to a medium within said elongate thermally conductive member." '028 Patent col. 1, line 65 - col.

2, line 1. The specification goes on to teach that, "[i]n the illustrative embodiment convective cooling is provided by movement of a medium 102 <u>through</u> the channel formed by elongate heat sink 101." <u>Id.</u> at col. 3, lines 10-13 (emphasis added). Similarly, it explains "convection cooling by flow of air <u>through</u> tubular heat sink 101 is utilized such that cool or unheated air <u>enters</u> tubular heat sink 101 at its lower end <u>and</u> <u>exits</u> from the upper end as heated air." <u>Id.</u> at col. 4, lines 4-7 (emphasis added). Considering the patent's teachings within the specification, because this court understands Defendant's proposed construction to imply that the fluid is surrounded on all sides, it runs contrary to how a person of ordinary skill in the art would understand the teachings of the patent. The invention teaches the free movement of a medium through the elongate member, suggesting that Plaintiff's alternative construction "found within" is more appropriate.

Next, the court looks to the prosecution history of the patent. Here, Defendant contends that the '536 Patent, a predecessor to the patents at issue, was amended to replace "within" with "contained." (Def.'s Resp. Mem. (Doc. 127) at 22.) Defendant does not argue, however, that this amendment amounts to a prosecution history disclaimer. This court likewise does

not find that such an amendment amounts to an unequivocal disclaimer. See Omega Eng'g, 334 F.3d at 1324-25.

This court's review of the extrinsic evidence only serves to further support this conclusion. Both parties' expert witnesses agree that the elongate member has an opening at the top and bottom. (York Decl. (Doc. 119-3) ¶ 67; Bretschneider Suppl. Decl. (Doc. 116) ¶¶ 72-73.) Nonetheless, Defendant contends that unless the medium (i.e., air) is enclosed within the elongate member, the cooling feature of the invention is lost. (Def.'s Mem. (Doc. 115) at 23.) Because the overwhelming intrinsic evidence supports Plaintiff's preferred construction, the court will adopt "found within" with respect to this term.

### G.    "channel"

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "channel" ('303 Patent claim 9; '028 Patent claims 8 & 22) | "the space defined by a pair of heat dissipation protrusions" | "a hollow extruded extended structure" |

The court starts with the claim term itself and the ordinary meaning that would be attributed to the term by a person skilled in the relevant art. The terms within the claims at issue read:

A light source in accordance with claim 1, wherein: said elongate thermally conductive member comprises a channel.

'303 Patent, col. 4, line 65-67; '028 Patent, col. 5, Lines 1-3

(identical phrasing).

> A radiation emitting source in accordance with
> claim 19 wherein:

> said elongate thermally conductive member
> comprises a channel.

'028 Patent, col. 6, lines 13-16.

The court next looks to the specification. The

specification provides in relevant part that

> [A] light source 100 in accordance with the invention
> includes an elongate thermally conductive member or
> heat sink 101. Elongate heat sink 101 is formed of a
> material that provides excellent thermal conductivity.
> Elongate heat sink 101 in the illustrative embodiment
> of the invention is a tubular aluminum extrusion. To
> improve the heat dissipative properties of light
> source 100, elongate heat sink 101 is configured to
> provide convective heat dissipation and cooling. As
> more clearly seen in FIG. 2, tubular heat sink 101 is
> hollow and has an interior cavity 103 that includes
> one or more heat dissipating protrusions 105.
> Protrusions 105 are shown as being triangular shaped
> fins, but may take on other shapes. Protrusions or
> fins 105 are integrally formed on the interior of
> elongate heat sink 101. Each pair of fins 105 defines
> a channel 105a. In the illustrative embodiment
> convective cooling is provided by movement of a medium
> 102 through the channel formed by elongate heat sink
> 101.

'028 Patent, col. 2, line 63 – col. 3, line 13 (emphasis

added). Figure 2 is pictured below.



FIG. 2

(Id. fig. 2.) The specification goes on to explain:

> Fins 105 may vary in number and location depending on
> particular LED layouts and wattage. In some instances,
> fins may be added to the exterior surface of tubular
> heat sink 101, such as shown in FIGS. 4 and 5 by fins
> or protrusions 501, 503 which also define a channel
> 505.
>
> . . . .
>
> Although light source 100 is shown as comprising
> an elongate tubular heat sink, other extruded elongate
> members may be used such as channels.

(Id. col. 3, line 56 - col. 4, line 3 (emphasis added).) Figures

4 and 5 are pictured below.



**FIG. 4**



**FIG. 5**

(<u>Id.</u> figs. 4 & 5.) A patentee has acted as their own
lexicographer when they have "clearly set forth a definition of
the disputed claim term in . . . the specification[.]" <u>CCS</u>

Fitness, 288 F.3d at 1366-67 (citation omitted). Here, this court finds that the patentee acted as a lexicographer by clearly defining "channel" within the specification. See Markman, 52 F.3d at 980. As the specification makes evident, "[e]ach pair of fins . . . defines a channel[.]" '028 Patent col. 3, line 10. The use of "fins" within this definition may be understood, in light of the entire patent, to refer to "heat dissipating protrusions" more generally. (See Patent '028 col. 3, lines 4-6 ("As more clearly seen in FIG. 2, tubular heat sink 101 is hollow and has an interior cavity 103 that includes one or more heat dissipating protrusions 105. Protrusions 105 are shown as being triangular shaped fins, but may take on other shapes."); Patent '028 col. 3, lines 58-61 ("In some instances, fins may be added to the exterior surface of tubular heat sink 101, such as shown in FIGS. 4 and 5 by fins or protrusions 501, 503 which also define a channel 505.").) Further, nothing within the prosecution history contradicts applicant's definition of this term within the specification.

With respect to the parties' expert witnesses, both contend that the specification clearly defines the term in question (See York Decl. (Doc. 119-3) ¶ 74; Bretschneider Suppl. Decl. (Doc. 116) ¶ 99.) However, the experts disagree as to whether a channel must be "extruded" and "elongate." Because the

specification clearly teaches that the elongate member "may comprise an extrusion," and does not require that it be an extrusion, '028 Patent, col. 2, lines 15-18, this court will not allow Defendant's expert testimony to contradict the intrinsic evidence to the contrary. Accordingly, this court will adopt Plaintiff's proposed construction of "channel."

### H.    **"some" and "others"**

| Claim Term | Plaintiff's Construction | Defendant's Construction |
|------------|--------------------------|--------------------------|
| "some" (all claims) | "one or more" | "more than one of a group" |
| "others" (all claims) | "one or more different" | plain and ordinary meaning |

The court starts with the claim terms themselves and the ordinary meaning that would be attributed to the terms by a person skilled in the relevant art. Both "some" and "others" appear in Claim 1 of the '028 Patent, which states in part:

> [A] plurality of solid state light sources carried on said elongate member outer surface at least some of said solid state light sources being disposed in a first plane and others of said solid state light sources being disposed in a second plane not coextensive with said first plane[.]

'028 Patent, col. 4, lines 33-38 (emphasis added).

Because a person of ordinary skill in the art reads the claim term not only in the context of the particular claim but also in the context of the entire patent, Phillips, 415 F.3d at 1313, the court also considers how the parties agreed to

construe other terms not at issue. Here, the parties stipulated
to construe "plurality" as "two or more." (Joint Claim
Construction Statement (Doc. 106) at 2.) A stipulated
construction, once adopted by the court, is binding on the
parties just the same as any other claim construction. See Dig.-
Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc., 672 F.3d
1270, 1278 (Fed. Cir. 2012); see also Versata Software, Inc. v.
SAP Am., Inc., 717 F.3d 1255, 1262 (Fed. Cir. 2013) (holding
that a party "cannot now collaterally attack the claim
construction it has agreed to").

Reading this agreed-upon construction for "plurality" into
Claim 1 of the '028 Patent provides:

> [Two or more] of solid state light sources carried on
> said elongate member outer surface at least some of
> said solid state light sources being disposed in a
> first plane and others of said solid state light
> sources being disposed in a second plane not
> coextensive with said first plane[.]

'028 Patent, col. 4, lines 33-38 (emphasis added). In this
claim, "plurality of light emitting diodes" is the antecedent
basis for "said light emitting diodes." Cf. Baldwin Graphic
Sys., Inc. v. Siebert, Inc., 512 F.3d 1338, 1342–43 (Fed. Cir.
2008) (stating that subsequent use of "said" is understood to
refer back to the same claim term). It logically follows that
"some" of "two or more" must be one or more and "others" of said
"two or more" must likewise be one or more. Nothing in the

specification or prosecution history justifies a different outcome. Accordingly, this inescapable conclusion leads the court to adopt Plaintiff's proposed construction of "some."

Likewise, with respect to "others," because the first-referenced "plurality of solid state light emitting diodes" is the antecedent basis of both "some" and "others" it naturally follows that "others" would include different light emitting diodes from the initially mentioned plurality. Again, nothing in the specification or prosecution history warrants a different outcome. Accordingly, the court will adopt Plaintiff's proposed construction of "others."

## III. CONCLUSION

For the foregoing reasons, the court construes the disputed terms as follows:

| Claim Term | Court's Construction |
|---|---|
| "carried on" (all claims) | "supported on" |
| "a plurality of solid state light sources" ('028 Patent, claims 1-3, 5-8, 14, & 16-17) | "two or more packages, each of which comprise a solid state light source" |
| "disposed in a second plane not coextensive with said first plane" (all claims) | "disposed in a second plane that is not the same as the first plane wherein the plurality of LEDs are not disposed in a single plane perpendicular to the axis of the elongate thermally conductive member" |

| | |
|---|---|
| "plane" (all claims) | "a spatial relationship concerning certain identified locations on the elongate heat sink and having the specific mathematical description of a plane." |
| "heat dissipation protrusion" (all claims) | "projection from a surface designed to convect heat" |
| "contained" (all claims) | "found within" |
| "channel" ('303 Patent claim 9; '028 Patent claims 8 & 22) | "the space defined by a pair of heat dissipation protrusions" |
| "some" (all claims) | "one or more" |
| "others" (all claims) | "one or more different" |

**IT IS SO ORDERED.**

This the 22nd day of August, 2018.

_____
United States District Judge