# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| OPTOLUM, INC.,<br><br>          Plaintiff,<br><br>     v.<br><br>CREE, INC.,<br><br>          Defendant. | Civ. Action No. 1:17-cv-00687 |

**MEMORANDUM OF CREE, INC. IN SUPPORT OF *DAUBERT* MOTION PRECLUDING CERTAIN TESTIMONY OF WILLIAM B. SCALLY**

# TABLE OF CONTENTS

**Page**

I. Statement Of The Nature Of The Matter............ 1

II. Background Facts................................ 2
    A. Net Sales Rate ............................. 3
    B. Incremental Rate ........................... 8

III. Questions Presented............................ 9

IV. Argument...................................... 10
    A. Legal Standard ............................ 10
    B. Mr. Scally's Unreliable Damages Opinion
       Testimony Should Be Excluded ............... 13
       1. Incremental Rate ...................... 13
       2. Apportionment ......................... 20
       3. $10 Million Starting Point ............ 26
       4. Degnan & Horton Survey ................ 27
       5. Licensing Economics Review ............ 30
       6. Royalty Source Licenses ............... 32
       7. Prior Cree Licenses ................... 34
       8. Sensitivity Analysis .................. 37

V. Conclusion.................................... 38

i

# TABLE OF AUTHORITIES

**CASES**

*Core Wireless Licensing S.a.r.l. v. LG Elecs.*,
  Inc., 2018 WL 7199139 (E.D. Tex. Sept. 27,
  2018) ............................................ 28

*DataQuill Ltd. v. High Tech Computer Corp.*,
  No. 08CV543-IEG BGS, 2012 WL 1284381 (S.D.
  Cal. Apr. 16, 2012) ............................... 34

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ........................... 10, 11

*Eastern Auto Distribs., Inc. v. Peugeot Motors
  of Am.*, 795 F.2d 329 (4th Cir. 1986) ............... 12

*Enplas Display Device Corporate v. Seoul
  Semiconductor Co., Ltd.*,
  909 F.3d 398 (Fed. Cir. 2018) ................. 14, 15

*ePlus, Inc. v. Lawson Software*,
  700 F.3d 509 (Fed. Cir. 2012) ..................... 36

*Eshelman v. Puma Viotechnology, Inc.
  2019 WL 1092572 (E.D. N.C. Mar. 8, 2019)* ........... 10

*General Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ............................... 11

*IP Innovation LLC v. Red Hat, Inc.*,
  705 F. Supp. 2d 687691 (E.D. Tex. 2010) ....... 30, 31

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ............................... 10

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ..17, 19, 20, 24, 28, 30,
   31

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) .....................31

*Oglesby v. Gen. Motors Corp.*,
   190 F.3d 244 (4th Cir. 1999) ......................11

*Palacino v. Beech Mountain Resort, Inc.*,
   2015 WL 8675991 (W.D.N.C. Dec. 11, 2015) ..........11

*Phillips v. AWH Corp.*
   415 F. 3d 1303 (Fed. Cir. 2005) ...................24

*Power Integrations, Inc. v. Fairchild*
   *Semiconductor Int'l, Inc.*,
   904 F.3d 965 (Fed. Cir. 2018), cert. denied,
   139 S. Ct. 1265, 203 L. Ed. 2d 277 (2019) ..14, 20, 21

*Silicon Knights, Inc. v. Epic Games, Inc.*,
   2011 WL 6748518 ...................................12

*Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d
   1283, 1294 (Fed. Cir. 2015) .......................11

*Trana Discovery, Inc. v. Southern Research*
   *Inst.,*915 F.3d 249 (4th Cir. 2019) ................12

*Trell v. Marleet Electronics Corp.*,
   912 F.2d 1443 (Fed. Cir. 1990) ....................34

*Tyger Constr. Co. v. Pensacola Constr. Co.*,
   29 F.3d 137 (4th Cir. 1994) ...................12, 13

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ................22, 38

*VirnetX, Inc. v. Cisco Sys.*,
  767 F.3d 1308 (Fed. Cir. 2014) .....................33

*Volumetrics Med. Imaging, LLC v. Toshiba Am.*
  *Med. Sys., Inc.*,
  2011 WL 2470460 (M.D.N.C. June 20, 2011) ..........13

*Whitserve, LLC v. Comput. Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012) ...................26, 27

*Wordtech Sys. v. Integrated Networks Solutions,*
  *Inc.*,
  609 F.3d 1308 (Fed. Cir. 2010) ................27, 35

**STATUTES**

35 U.S.C. § 284 .............................. 2, 14, 15

**OTHER AUTHORITIES**

Federal Rule of Evidence 702 .........................11

3 *McCarthy on Trademarks and Unfair Competition*
  § 18:2 (5th ed.) ....................................17

# I. Statement Of The Nature Of The Matter

Cree, Inc. ("Cree") submits this Memorandum In Support of Defendant's *Daubert* Motion Precluding Certain Testimony of William B. Scally.  Mr. Scally is the expert designated by OptoLum, Inc. ("OptoLum") to offer testimony concerning damages in this matter. Fact and expert discovery has closed.  Certain aspects of Mr. Scally's proffered testimony should be excluded because that testimony is improper as a matter of law and is otherwise unreliable, as it is not tied to the facts of this case as required under *Daubert* and its progeny concerning damage experts.

Specifically, Mr. Scally improperly seeks damages beyond the claimed invention, fails to apportion damages to the claimed elements, and relies on sources of evidence which are inapplicable to the facts of the case such as an unconsummated OptoLum offer to sell the patents, inapplicable license surveys and non-comparable licenses.  In these circumstances, this

1

Court should exclude Mr. Scally's testimony concerning these topics.

## II. Background Facts

OptoLum retained William B. Scally to opine on damages for the alleged infringement of U.S. Pat. Nos. 6,831,303 (the '303 Patent) and 7,242,028 (the '028 Patent). Mr. Scally served an expert report on May 9, 2019. *See* Expert Report of William B. Scally (hereinafter "Scally Rpt.") (Declaration of Spencer K. Beall ("Beall Decl."), Exh. A). In his report, Mr. Scally hypothesizes that OptoLum should recover $31.3 million as a reasonable royalty under 35 U.S.C. § 284 for the alleged infringement of the '303 and '028 Patents. Mr. Scally applied a 10% running royalty rate to the net sales of the Accused Products accrued between 2013 and 2018 to reach his royalty. Scally Rpt. at 3. The proposed 10% royalty is comprised of two components: a 5% rate applied to the net sales of the Accused Products (the "Net Sales Rate"), and a 5% incremental value rate based on an alleged value of the

patents-in-suit to Cree's brand development (the "Incremental Rate"). *Id.* at 59.

### A. Net Sales Rate

As his starting point, Mr. Scally relies on ███████████ ████ ██████████████████████. Scally Rpt. at 31; Deposition Transcript of William Scally ("Scally Dep. Tr.") (Beall Decl. Exh. B) at 48:24-49:1, 49:6-15.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████.

Scally Rpt. at 31: Scally Dep. Tr. 49:24-50:2.

Mr. Scally also relies upon certain licenses and license surveys to devise his proposed 5% Net Sales Rate. *See* Scally Rpt. at 59-61. As reflected in the chart below, Mr. Scally relies on: (1) two Cree settlement licenses; (2) two know-how OLED license agreements;[1] (3) a 1997 Degnan & Horton survey of general industry royalty rate medians summarizing

---

[1] "OLED" refers to a technology known as "Organic Light Emitting Diodes."

3

anonymous opinions concerning the degree of
innovativeness of unidentified technologies; and (4) a
2014 survey of royalty rates providing median royalty
rates for certain identified industries.



*Prior Cree Licenses*.  Mr. Scally had access to 25
Cree licenses.  Scally Rpt., Exh. 10 (Beall Decl. Exh.
C).  For the purpose of determining his Net Sales Rate,
he relied on royalty rates from two licenses that Cree
negotiated with Feit Electric Co. ("Feit"), and Unity
Opto Technology Co ("Unity").  Scally Rpt. at 60.
There were the two that he determined to be most
comparable.  Scally Dep. Tr. 114:5-15.

Mr. Scally's summary of the terms of the Feit and
Unity license agreements show that the Feit license
payment is capped and based on a world-wide territory.
Scally Rpt., Exh. 10 (Beall Decl., Exh. C).  Both are

cross-licenses that involve combinations of lump sum and running royalty rate payments. *Id.* Scally Dep. Tr. 122:7-17. Mr. Scally admits that these licenses involve different subject matter than that of the Asserted Patents because they "do not relate to thermal management." Scally Rpt. at 60. Further, Mr. Scally acknowledges that the licenses "do not align with the terms of the hypothetical negotiation." *Id.* They are both settlement agreements. Scally Dep. Tr. 114:20-115:1.

*Royalty Source Licenses.* Mr. Scally also relied upon an OLED license between Universal Display Corporation ("UDC") and Panasonic Idemitsu OLED Lighting Co., Ltd. ((hereinafter "Panasonic License") (Beall Decl. Exh. D)) and a Memorandum of Agreement between UDC and Moser Baer Technologies, Inc. to license OLED devices ((hereinafter "MBT MOA") (Beall Decl. Exh. E)).[2] Neither license concerns thermal

---

[2] The MBT MOA is not a license at all. The actual license has not been made available. The MBT MOA is

management technology. Scally Rpt. at 60; Scally Dep. Tr. 75:6-75:20. Both agreements involve a combination lump-sum and running royalty payment. Scally Rpt., Exh. 11 (Beall Decl. Exh. F). Moreover, the royalty rates in each license reflects the value of licensing technical know-how in addition to patents. Scally Dep. Tr. 89:8-90:12, 98:6-11. Mr. Scally acknowledges that he did not, account for the value of the know-how separately from the patent license. Scally Dep. Tr. 97:7-99:9.

*1997 Degnan & Horton Survey*. The Degnan & Horton survey is a compilation of royalty rate data from 428 licenses executed between 1992 and 1997. *See* Degnan & Horton Survey of Licensed Royalties (hereinafter "DH Survey") (Beall Decl. Exh. G). The authors compiled available royalty rate data into three categories: "minor improvement," "major improvement," and

---

merely a recitation of expected terms. There is no evidence at all that an actual license was entered into, nor what its real terms were.

"revolutionary" technology.  *Id.  See also* Scally Dep. Tr. 37:19-22.  These levels of innovation were compilations of opinions by anonymous individuals concerning unknown technologies.  Scally Dep. Tr. 33:17-21, 34:6-10, 37:10-22.  The actual licenses, parties thereto, and the specific technologies are also unknown.  Scally Dep. Tr. 34:6-10, 34:14-21, 35:12-23, 43:11-44:7, 45:23-46:3.

*Licensing Economics Review (LER) Article*.  The 2014 Licensing Economics Review article provides median royalty rates broken down by industry sector.  *See* Licensing Economics Review Article (hereinafter "LER Article") (Beall Decl. Exh. H). For the Electrical and Electronics industry, the authors identified a median royalty rate of 4.3%.  For the Consumer Goods, Retail, and Leisure industry, the authors offered a median royalty rate of 5%.  *Id.  See also* Scally Rpt. at 60-61.

## B. Incremental Rate

Mr. Scally further opines that a 5% royalty rate in addition to the proposed Net Sales Rate is appropriate based on his estimate of the value that the Accused Products contributed to Cree's brand development. Scally Rpt. at 64. Mr. Scally did not measure or quantify any actual Cree brand value increase from 2013 to 2017. *See* Scally Dep. Tr. 182:15-19.

Mr. Scally arrived at the 5% rate based on two trademark licenses that involved 5% rates. Scally Rpt. at 59. *See* GE Trademark Licensing Inc. – Safety Quick Lighting & Fans Corp. Trademark License ("GE License") (Beall Decl. Exh. I), and Hoover Inc. – Capstone Industries, Inc. Trademark License (Beall Decl. Exh. J) ("Hoover License"). Mr. Scally selected these two licenses from a group of 14 licenses he had identified out of a database referred to as Royalty Source. A summary of the terms of those 14 Royalty Source Licenses was compiled by Mr. Scally. Scally Rpt., Exh. 9 (Beall Decl. Exh. K). Regarding the GE and Hoover

8

licenses, Mr. Scally acknowledges that "Cree was not licensing an established brand name in the hypothetical negotiation…" as the parties did in the two trademark license agreements.  Scally Rpt. at 59.  Further, Mr. Scally confirms that brand value is a separate asset from the right to make, use, and sell the Accused Products.  *See* Scally Dep. Tr. 180:23-181:3.

Mr. Scally further opines that "[i]t is possible that Cree would have been willing to pay a rate much higher than" the 10% combined rate Mr. Scally proposes.  Scally Rpt. at 64.  Mr. Scally proffers that even if a "20%" rate were applied to Cree's gross profit sales of the Accused Products between the 2013 and 2018 fiscal years, Cree's gross profit margin would remain "constant."  *Id*.

## III. Questions Presented

1. **Are Damages For Activities Other Than The Sale Of Accused Products Recoverable As A Reasonable Royalty?**

2. **Is Apportionment Required Where There Is No Proof That The Patented Feature Drove Customer Demand?**

9

3. **Is The Patent Owner's Unconsummated Offer Of A Lump Sum Value Permissible As A Reasonable Royalty Rate Starting Point?**

4. **Is Expert Reliance On License Surveys Permissible Where No Technical Or Economic Comparability To The Circumstances Of The Hypothetical Negotiations Has Been Shown?**

5. **Is Expert Reliance On Non-Comparable Licenses Permissible?**

6. **Is Testimony Concerning An Unsupported Sensitivity Analysis Permissible?**

## IV. Argument

### A. Legal Standard

Under the Federal Rules of Civil Procedure, district courts serve as gate-keepers to exclude unreliable or irrelevant expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Eshelman v. Puma Biotechnology, Inc.* 2019 WL 1092572 at *3 (E.D.N.C. Mar. 8, 2019) ("The trial court must perform the special gatekeeping obligation of ensuring that expert testimony meets both requirements" of being relevant and reliable). A district court's decision to exclude testimony under *Daubert* in a patent case is

10

governed by the law of the regional circuit.  *Summit 6,*
*LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1294 (Fed.
Cir. 2015).

A reliable expert opinion "must be based on
scientific, technical, or other specialized knowledge
and not on belief or speculation, and inferences must
be derived using…valid methods."  *Oglesby v. Gen.*
*Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999); *see*
*also Daubert*, 509 U.S. at 590 ("proposed [expert]
testimony must be supported by appropriate validation –
i.e. 'good grounds' based on what is known").

The proponent of the expert has the burden of
proving admissibility under the Federal Rule of
Evidence 702.  *Daubert*, 509 U.S. at 592 n. 10; *see also*
*Palacino v. Beech Mountain Resort, Inc.*, 2015 WL
8675991, at *2 (W.D.N.C. Dec. 11, 2015).  If the
proponent cannot meet this burden, the testimony should
be excluded.  *See e.g. General Elec. Co. v. Joiner*, 522
U.S. 136, 146 (1997) (affirming exclusion of expert
testimony where "there is simply too great an

11

analytical gap between the data and the [expert] opinion proffered"); *Silicon Knights, Inc. v. Epic Games, Inc.*, 2011 WL 6748518 at *7 (E.D.N.C. Dec. 22, 2011 (same).

*Daubert* scrutiny is particularly important "in a situation … when an expert has apparently taken factual data from the specific project in dispute, and formulated estimates of damages." *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 145 (4th Cir. 1994); *see also Eastern Auto Distribs., Inc. v. Peugeot Motors of Am.,* 795 F.2d 329, 338 (4th Cir. 1986) ("[s]crutiny of expert testimony is especially proper" in damages cases, where expert testimony "consists of "an array of figures conveying a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it.").

If an expert's opinion is not sufficiently tied to the facts of the case, or lacks a relevant evidentiary basis, the testimony should be excluded. *See e.g. Trana Discovery, Inc. v. Southern Research Inst.*, 915

F.3d 249, 255 (4th Cir. 2019) ("[a]n expert must offer an opinion that fits the case at hand, not some other, hypothetical case…"); *see also, Tyger*, 29 F.3d at 143 ("expert opinion evidence based on assumptions not supported by the record should be excluded").

**B. Mr. Scally's Unreliable Damages Opinion Testimony Should Be Excluded.**

**1. Incremental Rate**

Mr. Scally purports to analyze the 15 *Georgia-Pacific* factors in his expert report.[3] Referencing Factor 15, Mr. Scally concludes that Cree would have agreed to a 5% Incremental Rate to account for an increase in Cree's brand development from sales of the Accused Products. Scally Rpt. at 62-64; Scally Dep. Tr. 180:17-181:15. ██████████████████████████ ████████████████████████████████████ ███████████████ ██████████████████. Scally Rpt. at 32-

---

[3] *Volumetrics Med. Imaging, LLC v. Toshiba Am. Med. Sys., Inc.*, 2011 WL 2470460, at *6 (M.D.N.C. June 20, 2011) ("the Federal Circuit has held that, in applying this "hypothetical negotiation" approach, courts should look to 'the factors in *Georgia-Pacific*.' ").

34. This add-on brand development Incremental Rate is unreliable because it is based on a legally erroneous methodology and is not tied to the facts of this case.

A patentee may only receive the value that the patented technology contributed to the Accused Products, and nothing more. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc*., 904 F.3d 965, 977 (Fed. Cir. 2018), cert. denied, 139 S. Ct. 1265, 203 L. Ed. 2d 277 (2019) ("in the context of a utility patent, it is ***only*** the patented technology that is taken from the owner, so the value to be determined is ***only*** the value that the infringing features contribute to the value of an accused product") (emphasis added).

The statutory basis for a reasonable royalty -- 35 U.S.C. § 284 -- applies only for infringing activities. "[A] reasonable royalty "cannot include activities that do not constitute patent infringement, as damages are limited to those "adequate to compensate for infringement."" *Enplas Display Device Corporate v.*

14

*Seoul Semiconductor Co., Ltd.,* 909 F.3d 398, 411 (Fed. Cir. 2018) (*quoting, Astra Zeneca AB v. Apotex Corp.,* 782 F.3d 1324, 1343 (Fed. Cir. 2015)). In *Enplas,* the Federal Circuit overturned a jury's reasonable royalty award because that "award was based, in part, on non-infringing sales of non-accused [products]." *Id.* Including a damages amount in a reasonable royalty, under § 284 for activities other than patent infringement is wrong as a matter of law.

In the present case, Mr. Scally admits that his proposed "Incremental Rate" accounts for value ***other than*** the value that the patents-in-suit allegedly contributed to the Accused Products.

> Q: Okay. So the value of the brand was something other than being able to make, use, and sell the accused light bulbs? Correct?
>
> A: Yes. It was something else.
>
> Q: Okay. And that something else was what you have labeled brand? Right?
>
> A: Yes
>
> Q: And that 5 percent was a straight addition to the existing—to the 5 percent that you

15

determined for the rest of the factors of your analysis? Correct?

A: Yes. It is incremental.

Scally Dep. Tr. 180:23-181:15. Creating an add-on royalty rate for the Accused Products, to purportedly account for "business value" **_other than_** infringement by the Accused Products is wrong as a matter of law and should be rejected.

Moreover, even if an "incremental rate" based on alleged brand development were permitted by law (it is not), Mr. Scally's methodology for developing the Incremental Rate is unreliable and not tied to any facts of this case. Mr. Scally never measured or quantified Cree's business value, for which he purports to account. Scally Dep. Tr. 182:15-19.[4] Absent some measurement of that business value, Mr. Scally's analysis rests on pure speculation.

---

[4] Q: You did not actually measure or quantify the actual brand value increase from 2013 to 2017, did you?
A: No, I did not."

Further, Mr. Scally's reliance on the 5% rate from the GE and Hoover trademark licenses is legally improper because those licenses are not comparable to the facts in the hypothetical negotiation. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) (explaining that expert testimony improperly relying on licenses with no "other discernable relationship to the claimed technology" must be rejected.) (*quoting, ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d at 860 (Fed. Cir. 2010)).

As an initial matter, the trademark licenses represent the transfer of the value of an established brand (*i.e.*, "GE" or "Hoover") to the licensee.[5] ██ ███████████████████████████████. Scally Dep. Tr. 177:4-21. These facts are inapposite to the present

---

[5] A trademark license is fundamentally different than a patent license as it concerns the licensor lending the imprimatur of its "mark" to the licensee for consideration. *See* 3 *McCarthy on Trademarks and Unfair Competition* § 18:2 (5th ed.), Anti-assignment-in-gross rule—Trademark cannot be assigned apart from the good will it symbolizes.

hypothetical negotiation because OptoLum had no

established brand to transfer to Cree.[6] 



. Scally Dep. Tr. 174:5-9.

Beyond the differences in economic circumstances, the GE and Hoover licenses did not involve comparable technology to that of the asserted patents. The GE and Hoover licenses related to ceiling fans and other general lighting fixtures. *See* Beall Decl. Exh. I ("GE License"): OPTOLUM_AZ00018230 (Licensed Products), and Exh. J ("Hoover License"): OPTOLUM_AZ00018257 (Licensed

---

6 

A: 

Q: 

A:

Products).  Mr. Scally concedes the technologies are not comparable.  Scally Dep. Tr. 170:14-19  ("Q: Is it your contention that the Safety Quick Light Device and ceiling fans are comparable to the OptoLum technology that is at issue in the hypothetical negotiation?  A: No, it's not.").

The factual circumstances of the GE and Hoover licenses are not comparable, economically or technologically, to the circumstances of the hypothetical negotiation.  Those licenses both involved a transfer of established brand value that does not exist in the hypothetical negotiation.  Moreover, the licenses involved different technologies.  It is reversible error to base a royalty rate on non-comparable licenses.  *See LaserDynamics*, 694 F.3d at 79 (reversing a jury verdict of reasonable royalty because jury relied, in part, on non-comparable licenses and explaining that "alleging a loose or vague comparability between different technologies or licenses does not suffice.").

19

Because Mr. Scally's Incremental Rate is based on non-comparable licenses and attempts to capture business value other than that of the Accused Products, Mr. Scally's testimony (including that set forth in Mr. Scally's analysis of *Georgia-Pacific* factors 6, 11, and 15) concerning the Incremental Rate is unreliable and should be excluded.

### 2. Apportionment

"A patentee is only entitled to a reasonable royalty attributable to the infringing features." *Power Integrations*, 904 F.3d at 977. The patentee must, in every case, give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features..." *Id*. (citations omitted). "The entire market value rule is a narrow exception to this general rule." *LaserDynamics*, 694 F.3d at 67 (affirming new trial on damages, in part, because expert reliance on entire market value rule (and failure to apportion) was not supported by market studies or consumer surveys to

20

establish that demand for the entire computer was driven by patented disc discrimination method). *See also Power Integrations*, 904 F.3d at 979 ("the entire market value rule is appropriate only when the patented feature is the sole driver of customer demand or substantially creates the value of the component parts.").[7]

Mr. Scally's damages opinion should be excluded because he (i) admittedly fails to apportion the value of the claimed features for the Accused Products; and (ii) does not demonstrate that the claimed features were the sole driver of consumer demand.

Mr. Scally admits that his damages model does not apportion the value of the Accused Products' other components unclaimed by the patents-in-suit. He testifies:

> Q: And you have done no apportionment in your opinions; isn't that right?

---

[7] Entire market value rule is referred to herein as "EMVR."

A: I have not, no.

Scally Dep. Tr. 21:24-22:16.

Where, as here, the patentee bases its damages analysis on the EMVR (*i.e.* does not apportion), "the patentee must prove that the patent-related feature is the basis for customer demand." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011) (granting new trial for violation of entire market value rule). Mr. Scally's testimony is devoid of any showing that the patented features—as opposed to the Cree-designed features—were the basis for customer demand.

Mr. Scally asserts that "demand for the Accused Products is driven by their ability to provide omni-directional light of an incandescent bulb, in a similar form factor and at a particular price point." Scally Rpt. at 27.[8] The fundamental deficiency in Mr. Scally's

---

[8] It is not Mr. Scally's opinion these benefits are derived from the Asserted Patent. He is clear in his deposition testimony that another OptoLum expert, Mr.

22

customer demand analysis is that **none** of these market facing features are claimed in the Asserted Patents. On their face, none of the asserted claims of the '303 and '028 Patents recite: (i) omnidirectional light; (ii) form factor (including a glass bulb or end cap); or (iii) price.

Further, Mr. York -- OptoLum's expert on whose testimony Mr. Scally relies -- concedes that these features are not required by the claims of the Asserted Patents. Deposition Transcript of Brent York ("York Dep. Tr.") (Beall Decl. Exh. L), 36:10-14 (omnidirectionality not required); 46:19-21 (long product life not required); 66:16-22 (cost reduction not required); 77:1-7 (neither globe nor end cap required). None of the market-facing features Mr. Scally analyzes as the basis of customer demand are patented features because they are not contained in the

_____

York, made that determination. Scally Dep. Tr. 20:4-15.

claim. [9]  Any alleged proof of these features driving customer demand is insufficient as a matter of law to justify application of the EMVR.  *See LaserDynamics*, 694 F.3d at 68 (rejecting admission of entire market value evidence which has "no demonstrated correlation to the value of the ***patented*** feature ***alone [...]***") (emphasis added).[10]

Moreover, it "is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential to the use of the [accused product]." *LaserDynamics*, 694 F.3d at 68.  The necessary proof requires showing that the asserted "functionality is what motivates a consumer to buy" the accused product

---

[9] "It is a "bedrock principle" of patent laws that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.* 415 F. 3d 1303, 1312 (Fed. Cir. 2005).

[10] While Mr. Scally did not identify the market-facing benefits (as noted in footnote 16), nor relate them to the Asserted Patents, it is apparently Mr. Scally's contention that the asserted claims "provid[e] for the functionality that drives demand for the Accused Products."  Scally Rpt. at 27.  This is a misleading and legally erroneous analysis.

in the first place. *Id.* "[P]roof that consumers would not want [the product] without such features is not tantamount to proof that any one of those features alone drives the market for [the product]. *Id.*

Measured against the correct standard, Mr. Scally's recitation of alleged consumer demand evidence is wholly deficient. All of Mr. Scally's asserted proof consists of statements that each of the market-facing features was important or even essential to the light bulb product.[11] This is insufficient. For the EMVR to be applicable, Mr. Scally must offer proof that the market-facing features motivate a consumer to buy the accused Cree LED light bulb in the first place. Mr. Scally offers no such proof. His analysis therefore, plainly fails to meet his burden to rely on the EMVR.

Mr. Scally's damages opinion is wholly deficient because Mr. Scally admittedly does not apportion damages to the patented features and fails to meet his

_____

[11] Scally Rpt. at 27-29.

burden of proof to rely on the EMVR.  Mr. Scally's opinion on damages should be excluded in its entirety.

### 3.  $10 Million Starting Point

Mr. Scally opines that his reasonable royalty rate "starting ranges" begin with a lump sum of $10 million. Scally Rpt. at 63.  Mr. Scally admits that the $10 million starting point is merely OptoLum's unconsummated offer to sell its patent portfolio during negotiations with Intellectual Ventures.  Scally Dep. Tr. 49:11-50:2.  He explained, "[t]he parties never consummated a transaction. That's correct." *Id.* 50:12-13.  This $10 million starting point evidence is simply the patent owner's inflated value and should be rejected as unreliable. *See Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 29-30 (Fed. Cir. 2012) (rejecting licensing negotiations because "patentees could artificially inflate the royalty rate by making outrageous offers").

More importantly, this "lump sum" starting point is unreliable because it is not tied to the facts of the

hypothetical negotiation.  A lump-sum payment is not
substantial evidence supporting a running royalty rate
without testimony explaining how such a payment would
be converted into a royalty rate.  *Whitserve*, 694 F.3d.
at 30 (rejecting lump-sum licenses as evidence to
support a royalty rate because expert failed to offer
testimony explaining how the lump-sum could be
converted into a royalty rate"); *see also Wordtech Sys.
v. Integrated Networks Solutions, Inc.,* 609 F.3d 1308,
1320 (Fed. Cir. 2010) (same).  Mr. Scally fails to
offer such testimony.  Absent such testimony, the $10
million lump-sum starting point for the reasonable
royalty analysis is not tied to the facts of the case
and testimony concerning that lump-sum value should be
excluded as unreliable.

### 4.  Degnan & Horton Survey

Mr. Scally relies on the DH survey to opine that a
3-8% royalty rate range is appropriate for "major
improvement technology."  Scally Rpt. at 61.  It is
reversible error to permit reliance on a non-comparable

27

licensing survey evidence.  *See LaserDynamics*, 694 F.3d
at 80 (granting new trail on damages because, in part,
1997 licensing survey "was not limited to any
particular industry but was across whatever
technologies were being licensed by the people who
responded"); *see also Core Wireless Licensing S.a.r.l.
v. LG Elecs., Inc.*, 2018 WL 7199139, *7-8 (E.D. Tex.
Sept. 27, 2018)(expert failed to show how "an industry
standard rate" was comparable to the patents at issue).

Mr. Scally cannot show comparability between the
surveyed licenses and the hypothetical negotiations
because Mr. Scally has no knowledge about the
underlying licenses at all.  He admits he has never
seen the licenses and has no idea who reviewed them:

> Q: So am I correct that the authors of this
> article don't actually have the 428 licenses
> that you refer to?
>
> A: I don't know.
>
> Q: You don't have them, do you?
>
> A: No I don't.
>
> Q: And you didn't look at them, right?

A: I did not.

Scally Dep. Tr. 35:12-23.

As a result, Mr. Scally has no idea who executed the licenses, which industries the licenses came from, or what territories the licenses covered. *See,* Scally Dep. Tr. 34:14-21, 36:13-18 and 37:3-8.

Likewise, Mr. Scally has no idea if any of the licenses are technologically comparable to the hypothetical negotiations. The DH Survey does not describe the licensed technologies that formed the basis for Degnan & Horton's ranking system, and Mr. Scally has no basis of knowing whether any involved comparable technology to the patents-in-suit. Scally Dep. Tr. 35:12-23.

Moreover, Mr. Scally has no idea how the DH Survey evaluated the licensed technologies to develop median royalty rate ranges for "major improvement" technology. *See,* Scally Dep. Tr. 38:1-6 (I don't have the underlying evidence to understand how—what would the

29

objective indicia be for putting an innovation into one of these three buckets.).

Because Mr. Scally cannot compare the licenses underlying the DH Survey royalty rate ranges and the facts of the case, reliance on the DH Survey is improper. *See LaserDynamics*, 694 F.3d at 80; *IP Innovation LLC v. Red Hat, Inc.*, 705 F. Supp. 2d 687691 (E.D. Tex. 2010) (determining that the market royalty rates from a Licensing Economics Review article were not a relevant or reliable source for developing royalty rate estimates for the patents-in-suit). Therefore, Mr. Scally's testimony concerning a royalty rate range of 3-8% based on "major improvement" technology from that article should be excluded.

### 5. Licensing Economics Review

Mr. Scally relies on the LER article (Beall Decl. Exh. H) as providing "an indication of what the parties would have been aware of as typical rates in the industry at the time of the hypothetical negotiation." Scally Rpt. at 60. As explained *supra*,

30

market royalty rates from articles or surveys—
specifically LER articles—are not reliable evidentiary
sources. *See e.g. LaserDynamics*, 694 F.3d at 80 (Fed.
Cir. 2012) (excluding expert testimony in part because
the expert's 1997 LER licensing survey was too
attenuated from the patented technology at-issue).

Mr. Scally's reliance on an LER article here is
improper because both categories he selected—Electrical
and Electronics industry and Consumer Goods, Retail,
and Leisure industries—are too generalized to provide a
relevant and reliable market rate for the patents in-
suit. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580
F.3d 1301, 1325, 1332 (Fed. Cir. 2009) (licenses in
"the same general computer field" are not
technologically comparable without showing a
relationship to the patented technology or the accused
infringing products); *see also IP Innovation LLC,* 705
F. Supp. 2d at 691 (excluding testimony because the
expert "offers no evidence that the alleged industry
agreements are in any way comparable to the patents in-

suit," given that the industries described in the report "encompass much more than the desktop switching feature at issue…").

Mr. Scally relies upon categories that encompass far more than lightbulbs or the technology of the patents-in-suit. Nevertheless, Mr. Scally selected the same 5% rate from the Consumer Goods, Retail, and Leisure industry, which is an even broader industry than Electrical and Electronics. Scally Rpt. at 61. Because Mr. Scally provides no evidence to explain how the LER article's 4.3% and 5% market royalty rates for broad industries are relevant to the patents-in-suit, Mr. Scally's opinion should be excluded.

### 6. Royalty Source Licenses

Mr. Scally's reliance on the two OLED licenses from UDC is unreliable because neither the Panasonic license nor MBT memorandum is technically comparable to the hypothetical negotiation. Mr. Scally argues that OLEDs are comparable subject matter to the patents-in-suit because they relate to "general illumination." (Scally

32

Dep. Tr. 75:6-20, 88:13-21).  This contention is without merit.  *See VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) ("When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice").  Because Mr. Scally cannot draw technical comparison between either license and the hypothetical negotiation, Mr. Scally's testimony should be excluded.

Furthermore, on the face of the licenses, neither the Panasonic License nor MBT License is economically comparable.  First, while the hypothetical negotiation concerned only two U.S. patents, both the MBT and Panasonic licenses transferred world-wide patent rights and know-how.  Panasonic License (Beall Decl. Exh. D), § 2.1 (License Grant).  Mr. Scally recognizes that the hypothetical negotiations would not involve technical know-how, and yet, Mr. Scally admits that his reliance on the two licenses was not adjusted for the value of the know-how.  Scally Dep. Tr. 97:19-99:9.  This

33

difference in the scope of transferred rights makes the
Panasonic and MBT licenses not comparable and testimony
relying on those licenses unreliable. *See, DataQuill
Ltd. v. High Tech Computer Corp.*, No. 08CV543-IEG BGS,
2012 WL 1284381, at *1 (S.D. Cal. Apr. 16, 2012)
(excluding expert testimony comparing industry licenses
involving transactions for entire portfolios of patents
with the hypothetical license that involved only two
patents).

Neither of the two Royalty Source licenses Mr.
Scally relies upon are comparable with the subject
matter or circumstances of the hypothetical
negotiation, and Mr. Scally's testimony based on those
licenses should be excluded.

### 7. Prior Cree Licenses

Mr. Scally relies on two prior Cree licenses that
are also not comparable to the hypothetical
negotiations. The use of a defendant's licenses is a
common mistake concerning excluded expert
testimony. *See e.g. Trell v. Marleet Electronics*

34

*Corp.*, 912 F.2d 1443 (Fed. Cir. 1990) (vacating a 6%
royalty rate partially based on plaintiff's prior
license with another company because the license was
not commensurate to the patent-in-suit); *Wordtech,* 609
F.3d at 1319 (declining to find licenses comparable
because they "arose from divergent circumstances and
covered different material").

Mr. Scally admits that neither Cree license is
technologically comparable to the patents-in-suit
because "they do not relate to thermal management."
Scally Rpt. at 60.[12]  Moreover, Mr. Scally admits that
the licenses "do not align with the terms of the
hypothetical negotiation" because both licenses were
negotiated "in the context of ongoing litigation" that
litigation included false advertising claims which Mr.

---

[12] In his November 26 deposition, Mr. Scally admitted
that his analysis of how the patents in the licenses
related to the patents in-suit was a judgment made by
OptoLum's technical expert, Mr. York.  Scally Dep. Tr.
121:18-122:5.

35

Scally recognized.[13]  Scally Dep. Tr. 116:16-22 (Q.

"When you did your analysis of this agreement, did you

include the fact that the litigation at issue included

false advertising claims?  A.  My analysis included

the fact that that claim was settled.")  However, Mr.

Scally did not adjust the license rate for the false

advertising claims at all. *Id.*, 117:15-23.[14]  Further,

the royalties paid under the license were capped.  That

is, the recited rate in the agreement is not accurate

because the effective paid rate depended on product

volume which was not taken into account.

---

[13] This is an appropriate basis for exclusion in itself.
*See ePlus, Inc. v. Lawson Software*, 700 F.3d 509, 523
(Fed. Cir. 2012) (affirming district court's
determination "that the license agreements were not
sufficiently probative because they were obtained
during litigation).

[14] There are several other glaring differences.  While
Cree and Feit were competitors in the same lighting
market, Cree and OptoLum have never had a comparable
relationship.  Scally Dep. Tr. 128:14-18; 131:6-9.
Also, while the Feit Electric license applied to
territories worldwide, the hypothetical negotiations
would have been limited to a U.S. territory only.
Scally Rpt., Exh. 10 (Beall Decl. Exh. C).

36

Because neither the Feit nor Unity Opto licenses are technologically nor economically comparable to the hypothetical negotiations, Mr. Scally's testimony concerning these licenses should be excluded as unreliable.

### 8. Sensitivity Analysis

Mr. Scally asserts that "if Cree paid a 20% royalty rate on the Accused Sales from FY13 to FY18, the median gross profit margin of Cree remains constant at 30%." Scally Rpt. at 64. Also, if the "sensitivity analysis was narrowed to the Consumer Lighting Segment, the median gross profit only drops by 2% (from 27% to 25%)." *Id.* at 65. This testimony is wholly unsupported. Mr. Scally does not even attempt to offer evidence linking his artificially chosen "20% royalty rate" to the facts of the present case. In rejecting the similar 25% Rule of Thumb for a reasonable royalty calculation, the Federal Circuit has made clear that such analysis is "far more unreliable and irrelevant than reliance on parties' unrelated licenses . . ."

37

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011). The court made clear that an "abstract and largely theoretical construct" fails the fundamental requirement of having a "basis in fact" with which to associate the chosen royalty rate. *Id*.

Like the unreliable 25% Rule of Thumb, Mr. Scally's "sensitivity analysis" also fails the fundamental requirement of incorporating a basis in fact tied to the hypothetical negotiation. Here, there is simply no factual basis offered for selecting the 20% royalty rate. Mr. Scally makes no attempt to explain from where that 20% value arises. Apparently, it arises out of thin air. Testimony based on such a number is simply impermissible and should be excluded as unreliable.

## V. Conclusion

Mr. Scally's proffered testimony on damages is fundamentally flawed for the reasons set forth above, including that it seeks damages beyond the claimed invention, fails to apportion damages to the claimed

38

elements, and relies on sources of evidence having no comparability to the facts of the case, such as an unconsummated OptoLum offer to sell the patents, inapplicable license surveys and non-comparable licenses. The court should comply with its gatekeeping obligations under *Daubert* and exclude Mr. Scally's testimony concerning these topics.

RESPECTFULLY SUBMITTED this 17th day of January, 2020.

By: */s/ Blaney Harper*
Blaney Harper
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: bharper@jonesday.com

*/s/ Lynne A. Borchers*
Lynne A. Borchers
NC State Bar No. 32386
**SAGE PATENT GROUP, PLLC**
4242 Six Forks Road,
Suite 1550
Raleigh, NC 27609
Telephone: (984) 219-3358
Facsimile: (984) 538-9037
Email: lborchers@sagepat.com

39

*Attorneys for Defendant*
*Cree, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

OPTOLUM, INC.,

      Plaintiff,

   v.

CREE, INC.,

      Defendant.

Civil Action No.
1:17-cv-00687

## CERTIFICATE OF WORD COUNT

I hereby certify that the Memorandum of Cree, Inc. in Support of its *Daubert* Motion to Exclude Certain Testimony of William B. Scally complies with the limitations set forth in Local Rule 7.3(d) by not exceeding 6,250 words, including the body of the brief, headings and footnotes, but excluding the caption, signature lines, certificate of service, cover page and index.

*/s/ Lynne A. Borchers*

Lynne A. Borchers

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| OPTOLUM, INC., | |
|      Plaintiff, | |
|   v. | Civ. Action No. 1:17-cv-00687 |
| CREE, INC., | |
|      Defendant. | |

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to counsel of record.

*/s/ Lynne A. Borchers*
Lynne A. Borchers